# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | **No. 1:14-cr-00004-TLS-SLC** |
| | ) | |
| SHAWN C. NORMAN | ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion to suppress (DE 58) filed by Defendant Shawn C. Norman,

seeking to suppress all evidence relating to his alleged purchases of controlled substances from

the confidential informant used by the government in this case. Norman alleges that the

government violated his Fifth and Fourteenth Amendment rights to due process of law by failing

to obtain the Court's approval prior to using the informant, who was on federal supervised

release at the time. The government disagrees, contending that even if it did fail to obtain the

Court's approval prior to the first controlled buy, the government's actions fall far short of

outrageous government conduct that violates due process rights.

The motion to suppress has been referred to the undersigned Magistrate Judge for a

report and recommendation pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Criminal

Procedure 59(b). (DE 61). Based on the following facts and principles of law, and after

considering the evidence and argument, I RECOMMEND that Norman's motion to suppress be

DENIED.

## I.  BACKGROUND

On January 27, 2016, Norman was indicted by way of a Superseding Indictment on three

counts of violating 21 U.S.C. § 841(a)(1), distributing a controlled substance, namely, a mixture

and substance containing heroin, and one count of violating 21 U.S.C. § 856(a)(1), maintaining a

place for the purpose of distributing and manufacturing a controlled substance. (DE 41). On

February 2, 2016, Norman pleaded not guilty to the charges in the Superseding Indictment. (DE

49). On June 20, 2106, Norman filed the instant motion to suppress. (DE 58). The government

filed a response in opposition to Norman's motion on July 6, 2016. (DE 60). The Court held an

evidentiary hearing on this matter on August 23, 2016, and a supplemental evidentiary hearing

on January 17, 2017. (DE 63; DE 74).[1] On June 26, 2017, Norman filed a post-hearing brief in

support of his motion to suppress (DE 85), and on July 18, 2017, the government filed its post-

hearing brief in opposition (DE 86). Norman then filed his reply to the government's post-

hearing brief on August 25, 2017. (DE 89).

## II.  FINDINGS OF FACT

At the evidentiary hearings, the government offered the testimony of Chad Wagner, an

officer with the Fort Wayne Police Department ("FWPD") assigned to the Federal Bureau of

Investigation (FBI) Safe Streets Drug and Gang Task Force ("the FBI Task Force"), and Derrick

Engelman, a homicide detective with the FWPD. (Tr. 6; Supp. Tr. 4). Wagner had 21 years of

experience with the FWPD; seven of those years he had been assigned to the FBI Task Force.

(Tr. 6). Engelman had been a homicide detective just over a year, but he had 19 years of

experience with the FWPD, 10 of which were in the Vice and Narcotics Division. (Supp. Tr. 4-

5). Norman did not call any witnesses, and the testimony of the government's witnesses was not

meaningfully contested. The Court finds each of the witnesses' testimony credible except as

otherwise noted, and finds as follows:

---

[1] The Court will refer to the transcript of the hearing on August 23, 2016 (DE 66), as "Tr. __" and the transcript of the supplemental hearing on January 17, 2017 (DE 76), as "Supp. Tr. __."

Toward the end of September 2013, Engelman was working a state drug investigation in which Roy Walker was the suspected crack-cocaine supplier. (Supp. Tr. 5-6). A FWPD informant purchased crack from a woman who was then obtaining the crack from Walker. (Supp. Tr. 6). After Engelman had overseen three controlled buys, Walker was arrested. (Supp. Tr. 7). Walker, who was nearing the end of his "parole" at the time, would have violated his parole if charged with selling controlled substances. (Tr. 7). As such, Walker and Engelman reached an agreement: if Walker cooperated and fulfilled his obligation to law enforcement, no charges would be filed against Walker for the three controlled buys made from him. (Supp. Tr. 7-8).

Engelman assumed that Walker was on state, rather than federal, parole, but Engelman did not verify this. (Supp Tr. 7). Pursuant to FWPD's normal practice, Engelman had Walker complete a questionnaire and a statement of understanding regarding his expected cooperation with the FWPD. (Supp. Tr. 9, 11-12, 28). The questionnaire provided advisements prohibiting drug acquisition or criminal participation without the express approval of the FWPD. (Supp. Tr. 11, 13). The questionnaire also advised that there were no specific promises, stating:

> [I]n agreeing to work for the Vice and Narcotics Bureau, I understand that no bureau agent may make any promises or predictions, explicit or implicit, regarding the disposition of any criminal charges that are pending against me, but that bureau agents will exert maximum effort to bring my cooperation to the full attention of the Allen County Prosecutor's Office and/or the United States Attorney's Office.

(Supp. Tr. 25). The questionnaire did not inquire into Walker's criminal history or his parole or other supervision status. (Supp. Tr. 13-14). In fact, it was not common practice within the FWPD to run a criminal history check on an informant. (Supp. Tr. 14). Nor was it common

practice for the FWPD to alert state probation or parole about an investigation, due to concerns about recent corruption within the state system. (Tr. 19-20; Supp. Tr. 15, 28, 48). Walker was assigned confidential informant number 1940. (Supp. Tr. 5-7).

After reaching their agreement, Engelman asked Walker to identify people from whom Walker could purchase a controlled substance and who were of interest to law enforcement. (Supp. Tr. 8). Walker identified his two drug suppliers—Deantre Rogers and Norman ("Rogers").[2] (Supp. Tr. 8).

On October 1, 2013, Engelman used Walker as an informant to make a controlled purchase of an ounce of powder cocaine from Rogers. (Supp. Tr. 16, 28-29). In doing so, Engelman provided $165 to Walker for payment of a drug debt, which is a common practice to keep a drug investigation going. (Supp. Tr. 16-17, 28-30). Engelman ran this controlled buy as a FWPD investigation, performing the pre-buy and post-buy informant searches and conducting the buy pursuant to FWPD procedures. (Supp. Tr. 30). Engelman provided guidance to the informant, FWPD buy money and vouchers were used, FWPD command supervised the buy, and FWPD equipment and evidentiary procedures were followed. (Supp. Tr. 30-31, 43). No FBI personnel assisted with the buy, as the Rogers investigation was a state case. (Supp. Tr. 32).

Engelman decided to use Walker to make a controlled drug buy from Norman in early October. (Supp. Tr. 21). At some point prior to the buy, Engelman contacted Wagner to discuss both Norman and Rogers as targets of a federal investigation using Walker as a confidential

_____

[2] Other than having a common informant, the Norman and Rogers investigations were not related. (Supp. Tr. 41).

informant.[3]  (Tr. 9).  Engelman would commonly notify the FBI Task Force for assistance with larger drug amounts and more complicated investigations, as in the fall of 2013 the Task Force was targeting drug sales and distribution in the inner city.  (Tr. 12, 30-32; Supp. Tr. 17-18).  Wagner was informed about the terms of FWPD's agreement with Walker.  (Tr. 32).  Wagner conveyed that the FBI Task Force was interested in working with Walker, but Wagner knew very little about Walker's credibility because the FWPD had run Walker's first buy.  (Tr. 10, 16-17).  Wagner expressed that he had to get formal approval from command in order to use Walker as an informant.[4]  (Supp. Tr. 23).

On October 4, 2013, Engelman used Walker to make the controlled drug buy from Norman.  (Supp. Tr. 21).  Engelman performed all of the informant searches, and he supervised and provided instruction for Walker.  (Tr. 14; Supp. Tr. 21).  The buy was documented on FWPD paperwork, and FWPD command was responsible for any supervisory approval.  (Tr. 11).  FWPD provided the buy money, and FWPD evidence and laboratory procedures controlled.  (Tr. 14-15).  Wagner and Darrin Strayer, a FWPD detective also assigned to the FBI Task Force,

---

[3] Engelman's testimony was not entirely credible as to when he first contacted Wagner.  Engelman testified that he spoke with Wagner prior to October 1, 2013, and that Wagner obtained approval and provided funds and the manpower for the buy from Rogers.  (Supp. Tr. 17-18).  But Engelman then retreated from this testimony, clarifying that he did not contact Wagner until *after* the October 1, 2013, and that Wagner was not involved in the October 1st buy from Rogers.  (Supp. Tr. 18-20).  Engelman explained that while Wagner provided money and manpower on the Rogers buys, Wagner would not have done so on the first buy—that is, before assessing Walker's credibility.  (Supp. Tr. 19).  Ultimately, the discrepancy in Engelman's testimony is not material to the outcome here, as the Court finds Wagner's testimony that he first met Walker on October 4, 2013, to be credible.  (Tr. 10, 12 30-32, 35; Supp Tr. 36, 40).

[4] Wagner had to obtain supervisory approval to open a federal investigation.  (Supp. Tr. 18).  A federal investigation would not begin with the first controlled buy; rather, establishing the informant's credibility was a prerequisite to opening a federal case.  (Supp. Tr. 19, 43).  The suspect also had to be a worthy federal target, which included large drug quantities.  (Supp. Tr. 43).  Here, Norman was known to be a significant drug supplier with a significant criminal history, and Norman was dealing in heroin, which has been an enormous safety problem in the community.  (Tr. 48).

helped with surveillance,[5] but no special FBI agents were involved. (Tr. 12-13, 15, 30-31, 35, 47). Wagner first met Walker after the buy and during the debriefing. (Tr. 12, 35). At this point, Wagner and the FBI Task Force were "game planning" so that when the FBI Task Force formally took over the case, all parties would know what direction the case would take. (Tr. 36). If all went well with the buy on October 4, 2013, it was Wagner's intent to formally sign up Walker as a confidential human source ("CHS") for the FBI Task Force. (Tr. 37).

With Walker found to be truthful after the first buy, Wagner was interested in opening a federal investigation of Norman. (Supp. Tr. 22-23). Wagner first had to open Walker as a CHS. (Supp. Tr. 35, 47). Shortly after the October 4, 2013, buy from Norman, Walker came to the FBI office to complete the CHS process, which included a criminal history check. (Supp. Tr. 35, 47). It was during this process that Wagner learned that Walker was on federal, rather than state, supervised release.[6] (Tr. 16-18; Supp. Tr. 36). Wagner and the FBI Task Force knew that a person on federal supervised release could not enter into an agreement to act as an informant or special agent of a law enforcement agency without permission of the Court. (Tr. 17-19, 38). Engelman, however, was unaware of FBI policy and the federal procedures involved in opening an FBI informant. (Supp. Tr. 23-24).

On October 14, 2013, Wagner started the process to obtain approval for Walker to

---

[5] Although Wagner and Strayer were assigned full-time to the FBI Task Force, they still retained their status as FWPD officers and maintained certain duties with the FWPD. (Supp. Tr. 44-45). For example, Wagner still participated in FWPD "homicide call" every six weeks, where he would get called out on a homicide case and have FWPD duties relating to that. (Supp. Tr. 44-45). Wagner explained that while his FWPD duties of "homicide call" tended to coincide with his FBI Task Force work because many homicides were gang and drug related, his involvement did not, in and of itself, turn a state murder investigation into a federal investigation. (Supp. Tr. 45-46).

[6] In fact, Walker was on eight years of federal supervised release, beginning in 2010. (Tr. 34).

function as a CHS.[7]  (Tr. 17-18).  As part of this process, Assistant United States Attorney

Anthony Geller provided Probation with a memorandum to review, which disclosed the

circumstances of Walker's arrest and the October 4, 2013, controlled buy that Walker

participated in.  (Tr. 38, 42; Supp. Tr. 36-37, 64).  Another memorandum was provided to

Probation about the Rogers investigation.  (Tr. 42).  On or about October 25, 2013, District

Judge William C. Lee approved Walker to work as an informant or special agent of a law

enforcement agency under the terms of his supervised release conditions and to perform

controlled drug buys for 120 days.  (Tr. 18, 20-21).  Wagner and Geller kept Probation informed

regarding Walker and the ongoing investigations.  (Tr. 46; Supp. Tr. 41-42).

On October 31, 2013, the FBI opened Walker as a CHS (Tr. 28), and thereafter, Walker

was working as an agent of the government (Tr. 39).  The FBI Task Force agreed to give Walker

some monetary compensation, in addition to the non-filing of his criminal charges, if he made

buys from several individuals.  (Tr. 43-44).  Walker then made two more controlled buys from

Norman—one on November 6, 2013, and the other on November 20, 2013.  (Tr. 22).  The FBI

Task Force formally conducted the operations of these two buys, with the assistance of the

FWPD Vice and Narcotics Division.  (Tr. 22-23).  Wagner led the pre- and post-buy searches of

Walker, although Engelman may have helped in these tasks.  (Tr. 24-25).  Wagner also provided

instruction for Walker.  (Tr. 24-25).  Supervisory duties were handled by an FBI supervisor, and

---

[7] FBI informant policy is covered in "The Attorney General's Guidelines Regarding the Use of FBI
Confidential Human Sources" ("CHS Guidelines").  The CHS Guidelines state, in relevant part: "Nothing in these
Guidelines is intended to create or does create an enforceable legal right or private right of action by a [CHS] or any
other person."  CHS Guidelines § I.F at 11.  For a person on federal supervised release, the FBI must first determine
whether use of the informant would violate his conditions, and if so, the FBI or designee must obtain the permission
of United States Probation ("Probation"), or if Probation denies permission, the court responsible for the person's
supervised release.  CHS Guidelines § III.B at 23.

additional procedures such as an FBI operational plan were used. (Tr. 25-26). FBI evidence and laboratory procedures were used, and different buy-money procedures were used than in the first controlled buy. (Tr. 28-30).

On December 6, 2013, Walker was arrested for several drug-related offenses. (Tr. 39). Wagner informed Probation of the arrest, but neither Wagner nor Engelman intervened on Walker's behalf. (Tr. 32, 39-42, 50; Supp. Tr. 32, 37). Ultimately, there was not enough evidence to charge Walker, and the criminal charges were dismissed. (Tr. 41, 50; Supp. Tr. 64).

On December 20, 2013, Wagner completed and swore to two criminal complaints and affidavits for Norman and Rogers. (DE 1-1; Supp. Tr. 34). That same day, a search warrant was served upon Norman's residence and place of business. (DE 1-1). In both affidavits supporting the criminal complaints against Norman and Rogers, Wagner states: "[O]n both October 1 and 4, respectively, a confidential informant working with the [FWPD] and the [FBI Task Force] stated that . . . ." (Def.'s Ex. A; Supp. Tr. 38-39). At the hearing, Wagner clarified that he intended this statement to mean that the FWPD started the investigation and the use of the informant, and the investigation later became a federal investigation. (Supp. Tr. 38-39). Norman was arrested on the criminal complaint on December 20, 2013, after the controlled buys and the search warrants in which controlled substances and various other evidence were taken into law enforcement possession and seized as a result of the controlled substance purchases made by Walker. (DE 1; DE 4).

### III. DISCUSSION

Norman maintains that the evidence relating to his alleged drug sales to Walker should be suppressed because the government used Walker, who was on federal supervised release at the

time, as an informant before obtaining the approvals required by the CHS Guidelines and the terms of Walker's supervised release. Norman contends that the government's use of Walker prior to obtaining the appropriate approvals constituted outrageous government conduct that violated Norman's Fifth and Fourteenth Amendment rights to due process of law. The government disagrees, asserting that (1) the Seventh Circuit has expressed great skepticism about the validity of the doctrine of outrageous government conduct; (2) that even if the doctrine exists, use of Walker as an informant in the first controlled purchase in violation of the CHS Guidelines and the terms of Walker's supervised release does not rise to the level of outrageous government conduct that violates due process rights; and (3) that Walker's first controlled buy from Norman—prior to the government obtaining the Court's approval for Walker to serve as a federal informant—was a state-run investigation, and thus, the government did, in fact, obtain the proper approvals before using Walker in the subsequent federal investigation. For the following reasons, the government's arguments are persuasive.

A. *Norman Has Not Cited Any Case Authority Recognizing the Outrageous Government Conduct Defense in the Context of a Motion to Suppress*

First, the government argues that the Seventh Circuit Court of Appeals has not recognized the outrageous government conduct defense with respect to motion to dismiss an indictment, much less, in a motion to suppress. This creates a "formidable barrier" to Norman's motion to suppress. *United States v. Walker*, No. 1:05-CR-70, 2006 WL 2849732, at *3 n.12 (N.D. Ind. Oct. 3, 2006).

In *United States v. Smith*, 792 F.3d 760, 764 (7th Cir. 2015), the Seventh Circuit explained that their "early cases expressed skepticism about the validity of the 'outrageous government conduct' defense." *Id.* (citing *United States v. Duncan*, 896 F.2d 275, 277 (7th Cir.

9

1990); *United States v. Belzer*, 743 F.2d 1213, 1216-20 (7th Cir. 1984)). The Court further observed that in *United States v. Boyd*, 55 F.3d 239, 241 (7th Cir. 1995), it articulated that "the [outrageous government conduct] defense 'does not exist in this circuit.'" *Smith*, 792 F.3d at 764 (quoting *Boyd*, 55 F.3d at 241). The Court explained that since *Boyd*, it has "repeatedly . . . reaffirmed [its] decision not to recognize the defense." *Id.* (collecting cases).

The Seventh Circuit acknowledged, however "that the Supreme Court has not closed the door entirely on this matter . . . ." *Smith*, 792 F.3d at 764. The Supreme Court stated in *United States v. Russell*, 411 U.S. 423 (1973), that "[w]hile we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed." *Id.* at 430; *see Smith*, 792 F.3d at 764. The Supreme Court elaborated that the government's conduct stopped "far short of violating that fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process Clause." *Russell*, 411 U.S. at 432 (citation and internal quotation marks omitted); *see Smith*, 792 F.3d at 764; *United States v. Tolentino*, 486 F. App'x 286, 288 (3d Cir. 2012) ("The pertinent question is whether the government's conduct was so outrageous or shocking that it amounted to a due process violation." (citation omitted)).

Here, Norman, for the most part, ignores the Seventh Circuit's position on the outrageous government conduct defense. In fact, Norman's briefs are essentially devoid of applicable case authority to support his argument for suppression. In his opening brief, Norman cites just one case, *Chambers v. State of Florida*, 309 U.S. 227 (1940), for the general principle that the Fifth and Fourteenth Amendments were intended to guarantee a criminal defendant with

procedural due process. (DE 58 at 1). *Chambers* does not, however, address due process in the context of a motion to suppress and use of an informant. In his post-hearing brief, Norman cites two more cases, *Burns v. United States*, 501 U.S. 129 (1991), and *Williams v. United States*, 503 U.S. 193 (1992),[8] for his suggestion that § 5D1.3 of the Federal Sentencing Guidelines, which pertains to standard conditions of supervised release, "is binding upon the courts." (DE 85 at 7). But these cases, too, do not mention a motion to suppress or the doctrine of outrageous government conduct. Finally, Norman does not cite *any* cases in his reply brief. (DE 89).

In short, Norman has not produced any case authority in which evidence was suppressed as a result of outrageous government conduct that violated due process. Nor has Norman disputed the government's assertion that the Seventh Circuit has not recognized the doctrine of outrageous government conduct as a means to bar prosecution. As such, Norman's arguments in support of suppression woefully lack the support of case authority.

### B. The Government's Purported Failure to Follow the CHS Guidelines and the Terms of Walker's Supervised Release Falls Short of a Due Process Violation

The government further argues that even if it did violate the CHS Guidelines and the terms of Walker's supervised release, such violation does not rise to the level of outrageous government conduct that violates due process. Again, the case authority supports the government's assertion, and Norman has failed to produce any relevant case authority to the contrary.

In *United States v. Christie*, 624 F.3d 558 (3d Cir. 2010), the Third Circuit found that even if the government did violate the CHS Guidelines by not signing up the informant as it

---

[8] For what it's worth, Norman also cites to Shakespeare's *Julius Caesar* in his post-hearing brief. (DE 85 at 11).

should have, the CHS Guidelines do not themselves create rights for criminal defendants. *Id*. at 573. The Third Circuit explained: "The [CHS] Guidelines are relevant, if at all, only to the extent that they indicate boundaries the FBI views and defining good law enforcement practices in working with [confidential informants]. They do not purport to be rules, much less a statement of the limits of constitutional behavior." *Id*.; *see also United States v. Fattah*, 858 F.3d 801, 814 (3d Cir. 2017) (rejecting the defendant's assertion of outrageous government misconduct in violation of due process, explaining that even if the agent violated the FBI policy, "the violation of internal policy alone does not amount to a violation of constitutional due process" (citation omitted)); *Slusser v. United States*, Nos. 3:11-CR-78-TAV-HBG, 3:12-CV-554-TAV, 2015 WL 5254110, at *2 (E.D. Tenn. Sept. 9, 2015) (agreeing that the Department of Justice Informant Guidelines "do not have, and do not purport to have, the same status as constitutional and statutory rights"); *United States v Gioelo*, No. CR-08-240-2 (BMC), 2011 WL 13127953, at *7 (E.D.N.Y. 2011) (stating that the agent was under no constitutional requirement to comply with the CHS Guidelines before identifying the informant as a CHS in the officer's affidavit to the magistrate judge). As such, the Court concluded that the government's alleged failure to abide by the CHS Guidelines did not constitute outrageous government misconduct, emphasizing that the "[c]ases in which we have found due process violations have involved far more egregious government conduct." *Christie*, 624 F.3d at 573; *see Tolentino*, 486 F. App'x at 288 ("[T]he challenged conduct must be shocking, outrageous, and clearly intolerable, thus violat[ing] our sense of fundamental fairness or shock[ing] the universal sense of justice." (alterations in original) (citations and internal quotation marks omitted)).

In *United States v. Gregory*, No. CRIM. 01-20142-KHV, Civ. 03-3393-KHV, 2005 WL

3845344 (D. Kan. Sept. 12, 2005), a case before the District of Kansas, the defendant asserted ineffective assistance of counsel because, among other things, his counsel did not explain to him that evidence of the confidential informant's violation of his parole supervision agreement could be used at trial to either suppress evidence of the drug transactions or to impeach the informant. *Id*. at *9. The Court rejected the defendant's arguments, explaining that even if he could establish that the government knew the informant could not act as a paid informant under the parole agreement, "such conduct by itself is not so outrageous as to require suppression" of the confidential informant's testimony. *Id*. The Court then explained that "[g]overnment conduct is outrageous if considering the totality of the circumstances in any given case, the government's conduct is so shocking, outrageous, and intolerable that it offends the universal sense of justice." *Id*. (quoting *United States v. Sandia*, 188 F.3d 1215, 1219 (10th Cir. 1999)). The Court further explained that "[o]utrageous conduct generally requires government creation of a crime or substantial coercion to induce the crime." *Id*. (alteration in original) (quoting *Sandia*, 188 F.3d at 1219); *see also Watson v. Davis*, No. SA-16-CA-090-OLG, 2017 WL 3841927, at *10 (W.D .Tex. Aug. 31, 2017) (explaining that the government's use of a confidential informant who was wanted on a probation-revocation warrant did not make the government's use of such informant "illegal" as the defendant argued, because it only violated a *policy* of the sheriff's office).

In *United States v. Olsen*, 978 F.2d 1472 (7th Cir. 1992), the Seventh Circuit was confronted with several alleged acts of misconduct by the government, including facilitating the possible illegal reentry of a deported alien, using the person as an informant prior to approval by the federal parole commission, allegedly misrepresenting the polygraph results to gain approval, and failing to comply with the terms of approval which precluded the informant from handling

contraband or weapons.  *Id*. at 1482.  The Court rejected the defendant's assertion that these acts

by the government constituted outrageous government conduct, instead characterizing the acts as

"mere administrative errors."  *Id*.; *see also Walker*, 2006 WL 2849732, at *9 n.15 (concluding

that even if the officers had used the informant while he was on parole, this "would not deem the

conduct of the police as outrageous" (citing *Olson*, 978 F.2d at 1481-83)).

Thus, even if the government did violate the CHS Guidelines and the terms of Walker's

supervised release when using Walker as an informant for the first controlled buy on October 4,

2013, such a violation does not rise to the level of outrageous government conduct that violates

due process.  That is, the government's conduct in this instance falls "far short of violating that

fundamental fairness, shocking to the universal sense of justice, mandated by the Due Process

Clause."  *Smith*, 792 F.3d at 764 (quoting *Russell*, 411 U.S. at 432).  Consequently, I will

recommend that Norman's motion to suppress be DENIED.

### C.  The First Controlled Buy Appears to Have
### Been Primarily a State-Run Investigation

As a final matter, the government also argues that Walker's first controlled buy from

Norman—prior to the government obtaining the Court's approval for Walker to serve as a

federal informant—was a state-run investigation, and thus, the government did, in fact, obtain

the proper approvals before using Walker in the federal investigation.  The Court, however, does

not need to reach this argument, having concluded above that even if the government did violate

the CHS Guidelines and the terms of Walker's supervised release when using Walker as an

informant for the first controlled buy from Norman, such violation did not rise to the level of

outrageous government conduct that violated due process.

Having said that, Walker's first controlled buy from Norman on October 4, 2013, appears

to have been primarily be a state-run investigation. Engelman performed all of Walker's searches and provided instruction for Walker. The buy was documented on FWPD paperwork, and FWPD command was responsible for any supervisory approval. FWPD provided the buy money, and FWPD evidence and laboratory procedures controlled. Although Engelman contacted Wagner before the buy to discuss Norman as a target of a federal investigation using Walker as an informant, and although Wagner and Strayer did help with surveillance during the buy, Wagner knew very little about Walker at that time, and Wagner testified that establishing the informant's credibility was a prerequisite to opening a federal case. (Supp. Tr. 19, 43). Wagner met with Walker for the first time after the buy during the debriefing, and no special FBI agents were involved. *See generally United States v. Brewer*, 588 F.3d 1165, 1171 (8th Cir. 2009) (concluding that the federal officers were not so involved in the state investigation as to mandate that any search warrant be obtained pursuant to federal standards); *United States v. Slater*, 209 F. App'x 489, 494 (6th Cir. 2006) (same).

As such, on the evidence presented, Walker's first controlled buy from Norman on October 4, 2013, appears to have been primarily a state-run investigation, and there is no dispute that the government obtained the proper approvals for Walker to act as a CHS in the federal investigation and the two subsequent controlled buys in November 2013. Therefore, the government's final argument seemingly offers additional grounds upon which to deny Norman's motion to suppress.

## IV. CONCLUSION

For the above reasons, I CONCLUDE that the government's use of Walker as an informant in the controlled buys from Norman did not constitute outrageous government conduct

in violation of Norman's due process rights. I therefore RECOMMEND that Norman's motion to suppress (DE 58) be DENIED.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for each party. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the proposed findings or recommendations. Fed. R. Crim. P. 59(b)(2). FAILURE TO FILE OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE DISTRICT COURT'S ORDER. Fed. R. Crim. P. 59(b)(2).

SO ORDERED.

Entered this 25th day of September 2017.

/s/ Susan Collins
Susan Collins
United States Magistrate Judge